[Cite as *State v. Powell*, 2018-Ohio-4693.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
|  | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27951 |
|  | : | |
| v. | : | Trial Court Case No. 2017-CR-0887 |
|  | : | |
| RODNEY POWELL | : | (Criminal Appeal from |
|  | : | Common Pleas Court) |
| Defendant-Appellant | : | |
|  | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of November, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

CARLO C. MCGINNIS, Atty. Reg. No. 0019540, 55 Park Avenue, Oakwood, Ohio 45419
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Rodney Powell was convicted after a jury trial in the Montgomery County Court of Common Pleas of robbery, a second-degree felony, and domestic violence, a first-degree misdemeanor. The trial court sentenced him to up to five years of community control.

{¶ 2} Powell appeals from his convictions, claiming that his conviction for robbery was based on insufficient evidence and against the manifest weight of the evidence, that the trial court should have instructed the jury on the lesser included offense of theft, and that cumulative errors denied him a fair trial. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 3} The State's witnesses at trial consisted of the complainant, Heather Kurtz, her brother, Richard (whom she called "Brother"), and Dayton Police Officer Zach Banks. Their testimony and supporting exhibits established the following facts.

{¶ 4} Powell and Heather Kurtz were in a relationship for more than ten years, and they have a son together. While they were together, they resided in the Kurtz family's home with Kurtz's father and brother. According to Kurtz, Powell moved many of his belongings out of Kurtz's home around April 2016. After that time, Kurtz usually would take their son to school, and Powell would pick the son up from school and take him back to Kurtz's residence; Powell left the residence before Kurtz got home from work.

{¶ 5} On March 21, 2017, Kurtz went to a doctor appointment and then went to work, which began at 10:30 a.m. Powell took their son to school, and he and Kurtz texted several times during the day. In the afternoon, Powell showed up unexpectedly at

Kurtz's place of employment. The two talked for a few minutes, and Powell left; Kurtz stated that Powell "was just acting really weird. I could tell he'd been drinking."

{¶ 6} Kurtz returned home from work at approximately 7:00 p.m. and found Powell sitting on her porch, talking on his cell phone. Kurtz went inside and then upstairs to check on her son; she found the son asleep in a room off of her bedroom. Powell followed Kurtz inside and asked Brother, who was in the dining room, where Kurtz had gone; Brother responded, "Upstairs." When Kurtz turned to leave her bedroom, she found Powell standing in the doorway. Kurtz asked Powell what he was doing there, and Powell responded, "It's really over, isn't it?" Kurtz accused Powell of being drunk and told him to leave. Powell did not leave, so Kurtz gathered her purse, coat, cell phone, and keys, told Powell that she was leaving instead, and headed downstairs.

{¶ 7} Powell followed Kurtz and told her that he would leave, but once downstairs, Powell walked around Kurtz and sat in a chair in the living room. Powell accused Kurtz of cheating on him. Kurtz again said that she was leaving, and she called to Brother, who was now in the kitchen, that she would be back in a few minutes.

{¶ 8} Kurtz walked out of the house to her minivan. As she was preparing to grab the van's door handle, she sensed someone behind her and began to turn. Powell, who had followed her outside, grabbed the back of her head and started "slamming" her head into the back window of the van. With his other hand in a fist, Powell also punched Kurtz. Powell said to Kurtz repeatedly, "I know what you did."

{¶ 9} After slamming Kurtz's head against the van window numerous times, Powell pushed Kurtz onto the street. Kurtz landed on her elbows, with her back toward the ground. Powell "snatched" Kurtz's cell phone from her hand and told her that he was

going to "find out who it is." Powell then hit Kurtz with the phone and his fist approximately 10 to 15 times.

{¶ 10} Brother heard Kurtz yelling and looked out the door to see what was happening. Brother saw his sister on the ground and Powell hitting her head and punching her with his fist. Brother went outside and yelled at Powell. Powell and Brother tried to hit each other, but both slipped on the wet ground and fell. Brother saw Powell holding Kurtz's cell phone. Brother got up and ran to a neighbor's house to seek help. Kurtz got up from the ground and ran back to her house; Powell followed her inside. Powell grabbed something from the living room, exited the residence, and left in his truck. Powell still had Kurtz's cell phone in his hand when he left. Kurtz called the police from the house phone. That evening, Powell attempted to call Kurtz on her house phone several times.

{¶ 11} Officer Banks responded to the 911 call and spoke with Kurtz on her front porch. He noticed redness or a scrape on the right side of her forehead. Banks saw that Kurtz had her house phone with her; the officer did not see a cell phone in the front yard.

{¶ 12} Kurtz testified that she was in "severe" pain that night and her hand hurt. Kurtz went to urgent care the following day. The police took photographs of various bruises. Kurtz contacted Sprint to suspend service on her cell phone so that Powell could not use it, and she reported the cell phone stolen to her insurance company. Kurtz testified that her cell phone had an "almost neon green" case on it.

{¶ 13} At the end of the State's case, Powell made a Crim.R. 29 motion regarding the robbery charge, arguing that there was no evidence that Powell had left with Kurtz's

phone. The trial court denied the motion.

{¶ 14} Powell testified on his own behalf and presented four additional witnesses. His aunt testified that Powell came to her house at approximately 8:00 p.m. on March 21, 2017, which was after the altercation. She saw Powell with his cell phone, which she recognized, and did not see him with any other cell phone. The aunt testified that Powell had a royal blue case on his phone.

{¶ 15} Eric Copher, a long-time friend of Powell's, testified that Powell called him, upset, in the evening of March 21, 2017; Powell asked Copher to pick him up from his aunt's house. Copher and his cousin, Derrick, picked up Powell and drove to the residence of Jerrell Brown, Powell's brother, arriving around 8:15 p.m. The four men were together until approximately 10:00 p.m. Powell told them that he and Kurtz had "got into it," which Copher understood as an argument, not an altercation. Brown testified that Powell had said that he (Powell) and Kurtz had an argument about Powell's catching her cheating and that Powell "shook her up." Copher and Brown saw Powell with his cell phone, but not with another cell phone. Brown testified that Powell had a "kinda dark" blue case on his phone.

{¶ 16} Powell testified that he had been living with Kurtz on March 21, 2017. Powell stated that Kurtz took their son to school that day. At approximately 8:30 a.m., Powell received a phone call from a friend, who told Powell that he (the friend) had seen Kurtz getting into someone else's car. Powell drove down to where Kurtz's car was parked and took a photograph of her van. Powell texted Kurtz and asked if she had gotten to work on time; Kurtz responded that she "had barely made it." Shortly before 10:30 a.m., Powell went to watch Kurtz's parked car. He testified that he saw Kurtz get

out of someone's car, get into her own car, and drive away. Powell and Kurtz texted throughout the day while Kurtz was at work, as was their routine.

{¶ 17} Powell stated that he picked up his son from school and brought him home. Powell indicated that he was recently home from the grocery store, was on the phone, and was leaving the house to go back to the store when Kurtz came home from work. He stated that Kurtz went upstairs and changed her clothes. A few minutes later, he went upstairs to the bedroom with his cell phone in his hand. Powell showed Kurtz the photograph of her van and asked her if she wanted to explain what was going on and if their relationship was over. Powell stated that Kurtz refused to talk about it and started to leave. Powell responded to her that he would leave, but he needed to know what was going on because he would need to get his belongings out of the house.

{¶ 18} Powell stated that the argument continued as they went out of the house to Kurtz's van. Powell testified that he "just grabbed [Kurtz] by her coat, turned her around, * * * grabbed her other shoulder and * * * started shaking her." Powell stated that Kurtz "flopped" to the ground and started yelling. Powell denied that he had slammed Kurtz's head against the van's window or punched her in the face.

{¶ 19} Powell testified that he heard Brother yelling at him; Powell turned, swung at Brother, and fell down. Powell explained that Brother ducked and fell down, and he (Powell) fell down from swinging. Powell testified that he picked up his cell phone, which he had dropped when he fell, and left in his truck. Powell testified that he and Kurtz had the same kind of cell phones and that his phone had a blue case. Powell denied that he had taken Kurtz's phone. He noted that he had texted Kurtz's cell phone once around 11:00 a.m. the following morning, which was reflected in Kurtz's cell phone records.

{¶ 20} After closing arguments, the trial court, without objection, instructed the jury on robbery and domestic violence. After deliberations, the jury convicted Powell of both offenses. The court subsequently sentenced Powell to community control sanctions.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 21} We will address Powell's first, second, and third assignments of error together. They claim that his conviction for robbery was based on insufficient evidence (first assignment), that his conviction for robbery was against the manifest weight of the evidence (second assignment), and that the trial court erred in denying his Crim.R. 29 motion for acquittal on the robbery charge at the conclusion of the State's case (third assignment).

{¶ 22} When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a claim based on the sufficiency of the evidence. *State v. Page*, 2d Dist. Montgomery No. 26670, 2017-Ohio-568, ¶ 7, citing *State v. Sheppeard*, 2d Dist. Clark No. 2012 CA 27, 2013-Ohio-812, ¶ 51. "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.* In reviewing the trial court's

denial of a Crim.R. 29(A) motion at the end of the State's case, we consider only the evidence then available to the trial court. *Sheppeard* at ¶ 51.

{¶ 23} In contrast, when reviewing an argument challenging the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 24} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 25} As an initial matter, the State asserts that Powell has waived his sufficiency argument by failing to renew his Crim.R. 29 motion after all evidence had been presented at trial. In support of this argument, the State cites *State v. Edwards*, 3d Dist. Marion No. 9-03-63, 2004-Ohio-4015, which states that, "[i]n order to preserve a sufficiency of the evidence challenge on appeal once a defendant elects to present evidence on his behalf, the defendant must renew his Crim.R. 29 motion at the close of all the evidence." *Id.* at ¶ 6, citing *Helmick v. Republic-Franklin Ins. Co.*, 39 Ohio St.3d 71, 529 N.E.2d 464 (1988),

paragraph one of the syllabus. The State thus claims that, at most, we can review Powell's sufficiency argument only for plain error.

**{¶ 26}** We have expressly rejected the contention that a defendant must make a Crim.R. 29 motion at trial in order to challenge on appeal the sufficiency of the State's evidence regarding the elements of the offense of which the defendant was convicted. *State v. Short*, 2017-Ohio-7200, __ N.E.3d __, ¶ 23-26 (2d Dist.). Although this court had previously espoused that a Crim.R. 29 motion was required to raise a sufficiency argument on appeal, we noted in *Short* that the Ohio Supreme Court had since stated that the failure to file a Crim.R. 29(A) motion during a trial does not waive an appellate argument concerning the sufficiency of the evidence. *Short* at ¶ 24, citing *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163 (2001), and *State v. Carter*, 64 Ohio St.3d 218, 223, 594 N.E.2d 595 (1992). We have also repeatedly recognized that, "[e]ven where no Crim.R. 29 motion was made in the trial court, * * * 'a defendant's "not guilty" plea preserves the right to object to an alleged insufficiency of evidence.' " *State v. Erby*, 2d Dist. Montgomery No. 27799, 2018-Ohio-3695, ¶ 17, quoting *State v. Hill*, 2d Dist. Montgomery No. 25274, 2013-Ohio-2016, ¶ 28. *See also, e.g., Short* at ¶ 24; *State v. Osterfeld*, 2d Dist. Montgomery No. 20677, 2005-Ohio-3180, ¶ 8, citing *Jones* and *Carter*.

**{¶ 27}** Powell was convicted of robbery in violation of R.C. 2911.02(A)(2). That statute provides: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another[.]"

**{¶ 28}** Viewing the State's evidence in the light most favorable to the State, the jury could have reasonably found that Powell committed the offense of robbery. First,

the State presented sufficient evidence that Powell committed a theft offense. Kurtz testified that she carried her cell phone to the van, and that Powell forcibly took the cell phone from her hand after he pushed her to the ground. She indicated that Powell had said that he was going to "find out who it is." Kurtz further testified that Powell still had her cell phone in his hand when he swung at Brother, when he went back into the house after the assault, and when he left the residence in his truck. Kurtz testified, "Once he initially took it from me – that's the thing. I never got it back. He kept it." Brother also saw Powell with Kurtz's cell phone after the altercation.

{¶ 29} Kurtz's and Brother's testimony was supported by the fact that, shortly after the altercation, Powell tried to call Kurtz on the home telephone, not her cell phone. Cell phone records for Kurtz's cell phone displayed no incoming calls from Powell to Kurtz's cell phone on March 21, 2017 after the incident occurred and no outgoing calls or texts by Kurtz. (Powell and Kurtz had texted each other more than 60 times that day prior to the incident.) Powell further testified that she reported her phone as stolen and had her service suspended. The jury could have reasonably concluded that Powell took Kurtz's cell phone with the purpose to deprive her of that phone.

{¶ 30} Second, the State presented ample evidence that Powell inflicted physical harm in committing the theft offense. Powell claims that the only force involved in the alleged robbery was his snatching the cell phone out of Kurtz's hand. However, Kurtz testified that Powell banged her head against a van window numerous times, forced her to the ground, took her cell phone from her hand, and began to hit her with the phone and his fist. Kurtz testified that she had pain in her elbows and hand, and she had bruises and red marks from the assault. Kurtz complained of "severe" pain and went to urgent

care the following day. Although Powell suggests that the violence involved with the domestic violence "had no nexus to the alleged theft" of the cell phone, the jury could have reasonably concluded that Powell's actions in banging Kurtz's head against the van, hitting her with her cell phone, and punching her with his fist occurred as part of the commission of the theft of the cell phone.

{¶ 31} Given the State's evidence, the trial court did not err in denying Powell's Crim.R. 29(A) motion on the robbery charge, and Powell's conviction for robbery was based on sufficient evidence.

{¶ 32} As for Powell's manifest-weight argument, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the jury to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Powell had committed the charged offenses.

{¶ 33} Powell testified that he did not take Kurtz's cell phone, and his witnesses testified that they did not see Powell with Kurtz's cell phone. There was also evidence that Powell sent a text to Kurtz's cell phone number on March 22, 2017, the day after the incident. Nevertheless, the jury could have reasonably concluded that Powell's witnesses, who saw him after the incident in a different location, had no knowledge about whether Powell had taken Kurtz's cell phone. Moreover, the jury could have reasonably found, as argued by the State during closing arguments, that Kurtz's cell phone records for March 21, 2017, demonstrated that Kurtz no longer had her cell phone after the altercation with Powell and that Powell had the cell phone, as evidenced by the fact that

he called Kurtz's house phone rather than her cell phone. The jury was not required to accept Powell's denial of any theft based solely on the fact that he once texted her the following day. In summary, we cannot conclude that the jury lost its way in crediting the State's version of events and finding Powell guilty of robbery and domestic violence. Powell's conviction for robbery was not against the manifest weight of the evidence.

{¶ 34} Powell's first, second, and third assignments of error are overruled.

### III. Jury Instruction on Lesser Included Offense

{¶ 35} In his fourth assignment of error, Powell claims that the trial court erred in failing to give a jury instruction on the lesser included offense of theft.

{¶ 36} Powell did not request a jury instruction on theft or object to the instructions that were given. Accordingly, Powell has forfeited all but plain error with respect to the jury instructions. In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected Powell's substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45.

{¶ 37} "An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, * * * be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." *State v. Deem*, 40 Ohio St.3d 205, 206, 533 N.E.2d

294 (1988), paragraph three of the syllabus, *as modified by State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 26; *State v. Callahan*, 2d Dist. Montgomery No. 24595, 2012-Ohio-1092, ¶ 31.

{¶ 38} "If the evidence is such that a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense, then the judge should instruct the jury on the lesser offense." *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, ¶ 11, citing *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992); *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 192. In deciding whether to instruct the jury on a lesser included offense, the trial court must view the evidence in a light most favorable to the defendant. *Trimble* at ¶ 192. "The lesser-included-offense instruction is not warranted every time 'some evidence' is presented to support the lesser offense. * * * Rather, a court must find 'sufficient evidence' to 'allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense.' " (Emphasis sic.) *Id.*, quoting *Shane* at 632-633.

{¶ 39} In *State v. Frazier*, 2016-Ohio-727, 60 N.E.3d 633 (2d Dist.), the trial court denied a defendant's request for a jury instruction on theft during his jury trial for robbery. In denying the request, the trial court noted that the entire incident occurred on an RTA bus and involved a continuous interaction, where the defendant took the victim's e-cigarette and refused to return it; only a few minutes elapsed from the defendant's obtaining the e-cigarette and the assault on the victim. *Id.* at ¶ 62. Throughout that time, the defendant continued to exercise control over the e-cigarette and the victim repeatedly demanded its return. *Id.* The trial court concluded that the infliction of

physical harm was contemporaneous with the theft and was "intricately connected to the theft and that enable[d] the theft to be successfully accomplished." *Id.* We found no abuse of discretion in the trial court's decision, concluding that the trial court reasonably concluded that the facts did not warrant an instruction on the lesser included offense of theft. *Id.* at ¶ 63.

{¶ 40} Upon review of the law and the evidence before us, we find no error, plain or otherwise, in the trial court's failure to instruct the jury on the lesser included offense of theft in this case. Powell seized Kurtz's cell phone from her hand while he was assaulting her. As in *Frazier*, the infliction of physical harm was contemporaneous with the theft and enabled the theft to be successfully accomplished. Although Powell's underlying motivation behind the assault may have been his anger at Kurtz, rather than a means to effectuate the theft, motive is not an element of the offense; Powell cannot divorce his repeated assaultive behavior from his taking Kurtz's cell phone from her hand.

{¶ 41} Powell's fourth assignment of error is overruled.

### IV. Cumulative Error

{¶ 42} In his fifth assignment of error, Powell claims that "other errors were committed at trial not raised herein but apparent on the record and the cumulative effect of all the errors occurring at trial deprived appellant of a fair trial and due process."

{¶ 43} The cumulative error doctrine provides that a conviction may be reversed "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial[,] even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995); *see State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-

8366, ¶ 129. Powell has raised only one possible error, namely the lack of a jury instruction on theft, and we have concluded that no error occurred. In the absence of a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), it is not the role of an appellate court to independently review the record for additional potential errors that were not raised by counsel. Consequently, Powell has not demonstrated that multiple errors occurred. Under these circumstances, the doctrine of cumulative error does not apply. *See Moody* at ¶ 129, citing *Garner* at 64.

{¶ 44} Powell's fifth assignment of error is overruled.

## V. Conclusion

{¶ 45} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck
Heather N. Jans
Carlo C. McGinnis
Hon. Michael W. Krumholtz